

**FILED**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JUL 24 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| MERCURYGATE INTERNATIONAL, INC., a Florida corporation, | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | **VERIFIED COMPLAINT** |
| v. | ) | |
| | ) | |
| AMOUS INTERNATIONAL, INC., an | ) | |
| Illinois corporation; and OLEKSANDR | ) | |
| LOPATKIN, an Illinois resident, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | 1:19-cv-04962 |
| | ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Sidney I. Schenkier |

Plaintiff MercuryGate International, Inc. ("MercuryGate"), for its Verified Complaint against Defendants Amous International, Inc. and Oleksandr Lopatkin, hereby alleges as follows:

**INTRODUCTION**

1.      Since its founding in 2000, MercuryGate has revolutionized the logistics industry by providing technical solutions to logistics and transportation providers. At the heart of MercuryGate's successful business is its innovative and industry renowned Transportation Management System, or TMS. Developed by supply chain professionals over nearly two decades and through investment of tens of millions of dollars, MercuryGate's unique and proprietary TMS software has modernized the industry by enabling shippers to optimize and automate their freight services to improve customer service and lower costs.

2.     MercuryGate recently discovered that one of its own employees has betrayed it.  Defendant Oleksandr (a/k/a Alex) Lopatkin ("Lopatkin") is a former high-level, technically-adept employee.  He originally began employment as a Senior Consultant starting September 2010.  He was promoted over the years, and he served as MercuryGate's Director of Pre-Sales from September 2016 to October 2018, and then served as MercuryGate's Director of Development until his termination in June 2019.  Lopatkin worked remotely, first from the Chicago area, and then, due to personal reasons and with MercuryGate's permission, at times from Ukraine.  In his roles as a Director, Lopatkin was entrusted with, worked on, and had access to MercuryGate's trade secrets and other confidential information, including MercuryGate's TMS source code.  Further, in these roles, Lopatkin had contractual obligations and other duties to MercuryGate from various non-disclosure, non-compete, and non-solicitation provisions.

3.     On information and belief, while employed by MercuryGate, and in breach of Lopatkin's contractual and fiduciary obligations to MercuryGate, Lopatkin took advantage of MercuryGate's flexibility and compassion towards his personal situation when he created or helped to create Amous International, Inc. ("Amous") as a competitor to MercuryGate in the TMS industry.  Lopatkin then conspired with Amous to misappropriate MercuryGate's highly sensitive and proprietary trade secret source code in order to jumpstart Amous's business.

4.     Amous is a new entrant to the TMS industry.  It was incorporated on May 1, 2017, and began demonstrating certain features of its TMS application in the second half of 2018.  MercuryGate recently discovered Amous, and on information and belief, Amous was only able to launch a TMS application because it copied portions of MercuryGate's highly

confidential TMS source code. After all, Amous's headquarters is a house in the suburbs of Chicago. Further, Amous's Chief Executive Officer ("CEO") became the CEO and co-founded Amous after recently graduating college with a degree unrelated to transportation management. Moreover, the President of Amous is Lopatkin's father-in-law, Yuriy Khodan. Unsurprisingly, most of Amous's software engineers are in the Ukraine—the very place Lopatkin sometimes lived and worked.

5. Lopatkin knew that his conduct was wrong and, among other things, breached his contractual and fiduciary obligations to MercuryGate. In fact, Lopatkin's MercuryGate e-mails show that he knew he would "be in a lot of trouble" if he ever received Amous invoices on his MercuryGate e-mail. Indeed, when confronted with the fact that he had been conspiring with Amous and misappropriated MercuryGate's trade secrets, Lopatkin did not deny his wrongful conduct. And when Amous received MercuryGate's cease-and-desist letter, Amous tried to hide evidence of its misappropriation by immediately removing its online product demonstrations from, among other locations, its website, Facebook, Twitter, Instagram, LinkedIn, and YouTube.

6. MercuryGate had no choice but to file this lawsuit. Defendants' actions have violated federal and state laws, including laws against trade secret misappropriation. Further, Lopatkin's actions violated his contractual and fiduciary obligations. Absent the relief requested in this Verified Complaint, MercuryGate will be deprived of, among other things, the value of its trade secrets and will suffer irreparable harm.

## THE PARTIES

7.     Plaintiff MercuryGate International, Inc. is a Florida corporation with its principal offices located at 200 Regency Forest Drive, Suite 400, Cary, North Carolina. MercuryGate has provided innovative solutions in the transportation industry for nearly two decades.   Among these innovative enhancements is MercuryGate's Transportation Management System ("TMS") software.   MercuryGate delivers exceptional value for TMS users through improved productivity and operational efficiency. MercuryGate serves its transportation customers by delivering solutions that help grow businesses and drive freight savings.

8.     Defendant Amous International, Inc. is an Illinois corporation with its principal place of business located at 26 Yorkshire Woods, Oak Brook, Illinois. That address is a house. Amous purports to provide TMS software and website development services to logistics companies. Amous began advertising its Amous TMS services on its website and social media platforms in or around mid-2018.

9.     Defendant Oleksandr (a/k/a Alex) Lopatkin is an Illinois resident and former employee of MercuryGate.   Lopatkin worked for MercuryGate from September 1, 2010 through June 14, 2019.   Lopatkin's last position with MercuryGate was Director of Development.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over the claims for relief arising under the Defend Trade Secrets Act (18 U.S.C. § 1836) and the Computer Fraud and Abuse Act (18 U.S.C. § 1030).

11.     The Court has supplemental jurisdiction over the claims for relief arising under state law or common law pursuant to 28 U.S.C. § 1367.

12.     The Court also has diversity jurisdiction as the amount in controversy exceed $75,000 pursuant to 28 U.S.C. § 1332, and there exists complete diversity of citizenship among the parties.

13.     Amous and Lopatkin are subject to the Court's personal jurisdiction. This Court has personal jurisdiction over Amous for at least the reasons that Amous is incorporated in Illinois, has its principal place of business in this district, and committed the wrongful and tortious conduct alleged herein, and caused harm within the State of Illinois, including in this district. This Court also has personal jurisdiction over Lopatkin for at least the reasons that Lopatkin is a resident of Illinois, resides in this district, and committed at least some of the wrongful and tortious conduct alleged herein, and caused harm within the State of Illinois, including in this district.

14.     Venue is proper in the district in which this Court sits pursuant to 28 U.S.C. § 1391 because Defendants reside in this district, Defendants are subject to personal jurisdiction in this district, and a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.

## FACTUAL BACKGROUND

### A.     MercuryGate Develops Innovative TMS Software And Protects Its Confidential Trade Secret Source Code

15.     In 2000, a group of supply chain professionals with years of industry experience founded MercuryGate to transform the logistics industry by developing innovative software to manage domestic and global shipments.

5

16.     MercuryGate's TMS software serves shippers, third-party logistic providers, freight brokers, freight forwarders, and carriers with a single platform to procure, plan, optimize, execute, and settle freight movements all while providing end-to-end shipment visibility and data awareness.

17.     The MercuryGate TMS software alleviates enormous challenges transportation companies faced in managing their operations. Before MercuryGate's TMS software, logistics business and professionals lacked a cost-effective and scalable solution to track shipments across multiple modes of transportation.

18.     Today, through its unique proprietary features and automation, the MercuryGate TMS software has adapted to the ever-evolving transportation landscape. Although modern transportation needs and expectations are ever-growing, transportation capacity has declined. The MercuryGate TMS software provides features that allow logistics companies to locate capacity and options to meet their shipping needs in a capacity-limited market.

19.     As commerce continues to become more global, so too do the challenges associated with global trade regulations. MercuryGate's TMS software delivers comprehensive international capabilities to help customers excel in the global marketplace.

20.     Customers access these state-of-the-art features through MercuryGate's intuitive and easy-to-use confidential user interface. This proprietary interface enables the full functionality of the software while maximizing the efficiency of customer workflow.

21.     In fact, industry organizations have recognized MercuryGate as a leader in the TMS space. MercuryGate has won numerous awards and accolades because of its innovative

6

efforts to fix pain points in the logistics field through advanced software, including, among others: The North American Frost & Sullivan Award for Product Leadership; Gartner's Magic Quadrant 2009-2017 Challenger; Quadrant Knowledge Solutions 2017 Product Performance Leader in the Global TMS Market; Insights Success: The 30 Most Innovative Companies to Watch 2017; Inbound Logistics Top 100 Logistics IT Providers 2017; CIO Review 20 Most Promising Logistic Tech Solution Providers 2016; SupplyChainBrain 2016 Great Supply Chain Partner; and Food Logistics 2016 FL 100+.

22.      MercuryGate's award-winning features and user interface are the result of its confidential business and technical information, including, but not limited to, its trade secret source code, derivative works thereof, and customer lists (the "Trade Secrets"). The source code is unique and reflects twenty years of refinement and evolution.

23.      The source code for MercuryGate's groundbreaking features and user interface took years and millions of dollars to develop. Specifically, over the past two decades MercuryGate has invested over hundreds of thousands of hours in research and development of its TMS software, costing tens of millions of dollars.

24.      The Trade Secrets embodied in the MercuryGate TMS software are the culmination of an enormous amount of time, resources, and money. As such, MercuryGate has further expended significant efforts to maintain the confidentiality of its highly sensitive and proprietary trade secret source code.

25.      Among these efforts, MercuryGate has restricted physical and digital access to the Trade Secrets to authorized users with valid credentials. In order to use these credentials,

7

MercuryGate's authorized users must be physically connected to MercuryGate's network or connected through a Virtual Private Network ("VPN")—which also requires valid credentials.

26.     This access is strictly limited to legitimate MercuryGate business purposes, and only those users who *need* access to MercuryGate's source code are given access.   For example, of MercuryGate's nearly 150 employees, less than 50 have access to MercuryGate's trade secret source code.

27.     For the select employees that have access, MercuryGate has implemented a wide variety of policies governing this access.   For example, the MercuryGate employee handbook contains numerous instructions regarding the treatment and use of MercuryGate's sensitive information.   For instance, employees may not "[g]ive or transfer MercuryGate data or software to any person or organization outside MercuryGate without the authority of MercuryGate."

28.     Other measures MercuryGate has taken to protect the Trade Secrets and other confidential information include, but are not limited to work computer and server passwords, security access cards, confidentiality agreements, letters notifying departing employees to return all property belonging to MercuryGate, distribution of information on a need-to-know basis, and non-compete and non-solicitation agreements with its high-level employees.

29.     MercuryGate protects the Trade Secrets because they are highly valuable to MercuryGate by not being publicly known.   The information provides MercuryGate a competitive advantage precisely because it is secret and known only to MercuryGate.

**B.    Lopatkin Had Access To MercuryGate's Trade Secret Source Code**

30.    Defendant Lopatkin worked at MercuryGate from September 1, 2010 to June 14, 2019.

31.    Before his employment at MercuryGate, Lopatkin had no prior business experience with TMS software.

32.    In 2010, Lopatkin joined MercuryGate as a senior consultant.  On August 13, 2010, in exchange for his employment and compensation by MercuryGate, Lopatkin signed an "Agreement Regarding Confidential Information and Intellectual Property" (the "Confidentiality Agreement").

33.    The Confidentiality Agreement recognized that during the course of his employment, Lopatkin would be "exposed to confidential information regarding the business of MercuryGate."  Lopatkin agreed "not to disclose [MercuryGate] confidential information, either during or after my employment to any person outside of MercuryGate or its affiliates."

34.    Under the agreement, "confidential information" includes computer programs.

35.    Lopatkin's execution of the Confidentiality Agreement was knowing, willful, and informed and a condition of employment and a condition to Lopatkin receiving access to such confidential information.

36.    In his role as a senior consultant, Lopatkin worked on the customer side of MercuryGate's business.  That is, he worked in sales and helped configure the various settings in customers' TMS software upon purchase.  Lopatkin remained in a sales and configuration role until 2017, when he transitioned to a development role and began, at times, to work remotely from Ukraine for personal reasons.

9

37. Through his near decade tenure with MercuryGate, Lopatkin received several promotions and was thought to be a trusted employee, valued for his technical skills. MercuryGate rewarded Lopatkin with more responsibilities, and he eventually became Director of Pre-Sales in 2016 and Director of Development in 2018—both senior positions at MercuryGate.

38. As a Director, Lopatkin was responsible for key aspects of MercuryGate's TMS application. In these senior leadership roles, it was critical to his day-to-day duties that he have significant privileges and access to MercuryGate resources—including access to MercuryGate's confidential and proprietary trade secret source code.

39. During his time as a Director, MercuryGate offered Lopatkin the opportunity to enter into a sales incentive plan. On January 6, 2017, Lopatkin executed an "Individual Incentive Compensation Agreement (IICA)" ("Compensation Agreement").

40. Lopatkin's execution of the Compensation Agreement was knowing, willful, and informed.

41. The Compensation Agreement contained non-solicitation and non-competition provisions that covered Lopatkin's activities during his employment and for twelve months following the termination of his relationship with MercuryGate.

42. Lopatkin agreed that he would not solicit MercuryGate employees, including that he would not "either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment with the Company."

43. Lopatkin further agreed that he would not compete against MercuryGate, including that he would not "either directly or indirectly engage in activities that compete with

10

the Company or work for any entity that is part of the Company's Market." At all times during his employment, Lopatkin was informed that MercuryGate's source code was highly confidential company trade secrets.

44.     Through these agreements, Lopatkin expressed his understanding of the value and secrecy of the Trade Secrets, including MercuryGate's source code. MercuryGate's Trade Secrets drive MercuryGate's market share in the TMS industry.

45.     During his time at MercuryGate, Lopatkin owed fiduciary duties to MercuryGate, including the duties of care and loyalty, and had contractual obligations of confidentiality, non-solicitation, and non-competition.

46.     Lopatkin knew that misappropriation of the Trade Secrets would significantly and irreparably harm MercuryGate.

47.     Because MercuryGate's success depends in part on protecting its intellectual property, including its TMS source code, customer contacts and configuration preferences, and marketing plans, the provisions in the Confidentiality Agreement were reasonably necessary to protect MercuryGate's Trade Secrets that Lopatkin had while working at MercuryGate.

48.     Further, because Lopatkin was a Director at MercuryGate with access to the Trade Secrets and other confidential MercuryGate information, the non-solicitation and non-compete provisions in the Compensation Agreement were reasonably necessary to protect MercuryGate's Trade Secrets that Lopatkin had access to while working at MercuryGate.

**C.     Amous Enters The TMS Field With MercuryGate's Source Code**

49.     Amous was incorporated on May 1, 2017.

50.     In 2018, Amous's Co-Founder and CEO Mark Shevchuk graduated from the University of Miami with a degree in accounting.  Despite recently graduating college, with no relevant experience or degree in logistics or transportation, Mr. Shevchuk co-founded Amous, a company purportedly providing services to the logistics industry.

51.     Defendant Lopatkin's father-in-law, Yuriy Khodan, is the President of Amous.

52.     By at least July 2, 2018, Amous demonstrated certain features of its TMS software on its Facebook page—making for an unprecedented short time-to-market, especially considering Mr. Shevchuk's lack of experience in a field that took MercuryGate years to develop expertise even with logistics professionals as founders.

53.     Making its sudden appearance even more unbelievable, Amous's principal place of business is a residential address.

54.     Amous also has strong connections to Ukraine.  Amous's LinkedIn page indicates that nearly all of Amous's software engineers reside in Ukraine.

55.     Altogether, Amous's corporate situation is unusual and suspicious.  Amous lacks a non-residential business office and executives with industry experience, yet along with its heavy Ukrainian influence, Amous has been able to develop a complex, technical piece of software in an exceptionally short time.

56.     Amous promoted certain features of its TMS software through various YouTube videos.  Amous deleted those videos after receiving a cease-and-desist letter from MercuryGate on or around June 13, 2019.

57.     In these videos, Amous's user interface looked and functioned remarkably similar—identically in many cases—to MercuryGate's proprietary and confidential user interface. A few examples of the similarities include:

- The Amous header toolbar that customers use to interact with the program was identical in functionality to the MercuryGate header toolbar and remarkably similar in visual appearance.

- The Amous menu that customers used to navigate through the software was identical in structure, options, and extremely similar in visual appearance to the MercuryGate menu.

- The Amous object structure used by the software to organize user data and features was identical in functionality and name (with the exception of one character) to the MercuryGate object structure.

- Overall, the Amous styling and visual layouts are strikingly similar to the MercuryGate styling and layout. Amous even went as far as using a custom-designed MercuryGate icon.

58.     In addition to the visual similarities on the main page, the design and functionality of Amous's route board feature were virtually identical to the MercuryGate route board. While visual aspects of Amous's route board mirror MercuryGate's route board, the functionality demonstrates misappropriation. As an example, MercuryGate's route board displays the various shipping jobs and contains features to improve the efficiency of shipping. One of the features is the pinned note, which allows a job to have an important note to ensure necessary personnel see it. Amous's route board implements these same functionalities in an identical manner.

59.     Amous's TMS software further confirms the visual and functional similarities present in Amous's software from its now-deleted YouTube demonstrations.

13

60.     Although Amous's TMS software requires a username and password to access the application, the client-side JavaScript source code publicly available on the Amous TMS login page shows Amous misappropriated MercuryGate's trade secret source code.

61.     The Amous client-side JavaScript source code contains MercuryGate's unique and highly-customized variables, operators, and functions.   Specifically, as shown in the Amous code excerpt below, Amous uses MercuryGate's unique features and attributes like config groups and "currentEnterprise."

```
}, _ = function (e) {
    return e.routes
}, d = function (e) {
    return e.form
}, p = function (e) {
    return e.enterprises
}, f = function (e) {
    return e.routes.configsByNames
}, b = function (e) {
    return e.routes.configs[s.GENERAL_CONFIG_GROUP]
}, m = function (e) {
    return e.routes.configs[s.INVOICE_CONFIG_GROUP]
}, E = function (e) {
    return e.routes.configs[s.COMMUNICATION_CONFIG_GROUP]
}, O = function () {
    return Object(o.createSelector)(p, function (e) {
        return {
            enterpriseName: a.a.pathOr("", ["currentEnterprise", "enterpriseName"], e),
            guid: a.a.pathOr("", ["currentEnterprise", "guid"], e)
        }
    })
```

62.     MercuryGate's source code uses proprietary system attributes and features to define, organize, and configure its TMS application.  Amous's source code uses the same "CONFIG_GROUP," "Code Table," and "route / el / cl" attributes to define and configure its

TMS application. That indicates that Amous's backend source code is using the same architecture and object model as MercuryGate's. Similarly, MercuryGate uses the "currentEnterprise" attribute in configuring the user interface. Amous's use of the same attribute makes clear its configuration process is identical to MercuryGate's.

63. Amous's use of MercuryGate's unique and custom-built functionality, variables, and attributes can only be the result of copying. That is, similarities in Amous's source code to MercuryGate-designed code are not the result of a coincidence—but rather the misappropriation and misuse of MercuryGate's proprietary and trade secret source code.

64. Further, MercuryGate's source code embodies iterative developments and improvements over the application's twenty-year life. With that, some of the functionality in MercuryGate's application uses legacy techniques. Programmers developing such an application in or around 2017 would have used different techniques. The very fact that Amous's software includes the same legacy techniques despite coming to market nearly two decades later in 2017 further demonstrates Amous stole MercuryGate's proprietary trade secret code.

65. Given the extent of misappropriation, the theft had to come from a MercuryGate employee with substantial access to MercuryGate's Trade Secrets.

**D.  Lopatkin Conspired With Amous While Employed By MercuryGate, Breaching His MercuryGate Agreements**

66. Lopatkin's close ties with Amous are indisputable, for its President is Lopatkin's father-in-law. Like Amous's CEO Mr. Shevchuk, Mr. Khodan had no relevant experience in the logistics industry before working for Amous. Further, Lopatkin and Khodan

have shared several residential addresses. Lopatkin has even used the Khodan family name himself, going by "Alex Khodan" while working in Ukraine.

67.     Lopatkin even attempted to recruit personnel for Amous. While employed by MercuryGate, Lopatkin tried, on at least one occasion, to solicit a former MercuryGate human resources employee with intimate knowledge of MercuryGate's staffing requirements to join Amous.

68.     Lopatkin's social media activity further confirms his close relationship with Amous. Lopatkin "liked" a LinkedIn post by Michael Hillecke, a system process architect at Amous, demonstrating Amous's TMS software. This is the same (now deleted) demonstration that shows Amous's user interface—which it misappropriated from MercuryGate.



69.     As another example, Lopatkin is a member of a six-person private LinkedIn group. The group, titled "TMS = Transportation Management Systems in the future," is also owned by Hillecke.

70.     Indeed, not even Lopatkin could deny his relationship with Amous. After MercuryGate's Chief Technology Officer notified Lopatkin that he was being terminated and that MercuryGate had reason to believe he had conspired with Amous and provided Amous with the Trade Secrets, Lopatkin first responded by asking for the spelling of "Amous." After Amous was spelled for him, Lopatkin then merely replied "oh." Lopatkin did not deny conspiring with Amous or misappropriating MercuryGate's confidential information and made no inquiry regarding the allegations.

71.     Amous benefitted from its close ties to Lopatkin because he used his access to MercuryGate's source code to provide at least substantial portions of that source code to Amous.

72.     Lopatkin worked remotely for MercuryGate since 2010 and worked from Ukraine periodically since 2017. Through his senior positions, Lopatkin had administrative access and privileges on his MercuryGate computer. Lopatkin used this access—and his extensive technical skills—to hide his wrongful conduct from MercuryGate.

73.     As an example, MercuryGate's anti-virus software shows that the last login on the computer was when it was first issued to Lopatkin—indicating that MercuryGate-installed software on the computer had been bypassed or removed. As it turns out, Lopatkin performed a factory reset of the operating system in September 2018 without authorization from MercuryGate. Moreover, Lopatkin's MercuryGate computer no longer appeared in

17

MercuryGate's "Active Directory," which lists all the resources on the network. This prevented MercuryGate from, among other things, asserting control over the computer.

74.     Lopatkin's MercuryGate e-mails also indicate he took steps to cover his actions for Amous.  For example, GeltCo, Inc. sent Lopatkin an invoice to Lopatkin's MercuryGate email address.  GeltCo., Inc. is Amous's registered agent.  On information and belief, in response, Lopatkin told GeltCo to "change all further correspondence of ANY KIND" to go to a personal e-mail account.  He instructed GeltCo that "[t]he email that you have for Alex Lopatkina@mecirygate [sic] should NOT be in any of your systems because I will be in a lot of trouble. Please,please [sic] delete alex@mercurygate off you [sic] contact list for anyone in your office that sends ANY kind of correspondence all together."

75.     Although the invoice appears directed to a different company (Gears of Distribution, Inc.)—of which Lopatkin's father-in-law is also the President—the e-mail makes clear that Lopatkin did not want any Amous-related correspondences from GeltCo to make it to his MercuryGate e-mail.  Lopatkin asked GeltCo to send all correspondence to his khodan62@gmail.com e-mail account.  Lopatkin's MercuryGate e-mails reveal he had several other personal accounts, including at least: ipasasha@comcast.net, ikl@comcast.net, and alexl492@outlook.com.

76.     Lopatkin's awareness of MercuryGate's technical infrastructure allowed him to take steps such as these to reduce any trace of his illegal and disloyal conspiracy with Amous from MercuryGate's systems—that is, his misappropriation and breach were willful and malicious.

18

77. Knowing his actions would go undetected, Lopatkin provided Amous with the Trade Secrets in furtherance of their conspiracy.

78. MercuryGate terminated Lopatkin's employment on June 14, 2019 because of his wrongful and disloyal conduct.

79. MercuryGate was unaware of Lopatkin's disloyal conduct until less than two weeks before terminating him. In other words, Lopatkin was still employed by and receiving compensation from MercuryGate during his misappropriation of MercuryGate's trade secret source code and disloyal conspiracy with Amous.

80. Lopatkin maintained an intimate relationship with Amous during his MercuryGate employment. He also stole source code from MercuryGate in furtherance of his conspiracy with Amous, and took steps to conceal his unlawful conduct. Lopatkin's actions are not only a breach of his fiduciary duty, but are squarely at odds with the commitments and guarantees he made in his agreements with MercuryGate. Lopatkin's disloyalty to MercuryGate in favor of Amous confirms he was conspiring with Amous while employed by MercuryGate.

**E.** **Amous Hides and Conceals Its Wrongdoing In Response To MercuryGate's Cease and Desist Letter**

81. Shortly after MercuryGate discovered Amous and its misappropriation, MercuryGate sent a cease and desist letter to Amous's CEO, Mr. Shevchuk. Because Amous's place of business is a house, MercuryGate sent the letter to multiple addresses and through various means including a process server.

82. In its cease and desist letter, MercuryGate outlined Defendants' serious misconduct, including the theft and misappropriation of MercuryGate's Trade Secrets.

MercuryGate requested, among other things, that Amous immediately "eliminate all actual and derivative use of MercuryGate's trade secret source code," and "return any and all MercuryGate information and material."

83.     Further, MercuryGate instructed Amous to "preserve all information and evidence related to the issues raised in this letter, including any hard copy documents, electronically stored information (such as personal and work email files), laptop computers, tablets, smartphones, removable media (such as USB drives, DVDs, and CDs), or any other location."

84.     MercuryGate also sent a similar cease and desist letter to Lopatkin. On June 20, 2019, the day by which MercuryGate had requested a response from Amous, an attorney contacted MercuryGate's counsel and stated that he represented both Lopatkin and Amous. Lopatkin's and Amous's attorney informed MercuryGate that they were investigating the points made in the cease and desist letters and would provide a detailed response "early next week."

85.     Subsequent communications with Lopatkin's and Amous's attorneys failed to provide a substantive response until July 5, 2019. On July 5, 2019, counsel for Lopatkin and Amous sent a letter in which they denied misappropriation and wrongful conduct. No attempt was made by Lopatkin or Amous, however, to explain, among other things, why Amous's client-side JavaScript source code on the Amous login page is strikingly similar to MercuryGate's confidential user interface, or how it came to be that Amous uses the same confidential, unique and highly-customized variables, operators, and functions as MercuryGate. Further, and tellingly, counsel for Lopatkin and Amous did not deny that

20

Lopatkin worked with and for Amous.    As a result, MercuryGate had no other option but to commence this litigation to, among other things, protect its Trade Secrets and contractual rights.

86.     After Amous and Lopatkin received MercuryGate's letter and before their counsel responded, Amous did not ignore it.  In fact, Amous took active steps to conceal its misappropriation upon receiving the letter

87.     Shortly after receiving MercuryGate's cease and desist letter, Amous removed its product demonstrations from YouTube, its website, and social media pages.  The haste with which its product demonstrations were removed is evident from the disorganized state the removals left the Amous website.

88.     Where there once was enthusiastic promotion of the Amous TMS software, Amous's website now left blank screens reading, "This video is unavailable."



89. The demonstrations Amous promoted through its social media platforms were also now unavailable. A post from June 12, 2019 on the Amous LinkedIn page encouraging visitors to watch a demonstration of its program was now no longer available to view.



90. On information and belief, Amous removed demonstrations of its product to conceal its theft of MercuryGate's highly sensitive trade secret source code.

91. Because Lopatkin was working from Ukraine, MercuryGate could not collect the work computer MercuryGate had issued to him upon termination. As a result, during the exit telephone call and in a follow-up correspondence, MercuryGate made clear that Lopatkin

was under an obligation to return all MercuryGate property, including all MercuryGate confidential information, his work computer, and credentials. On July 3, 2019, MercuryGate retrieved Lopatkin's work computer from Lopatkin's attorney, and Stroz Friedberg evaluated it.

92.     Lopatkin's work computer reveals that he took efforts to destroy data *after* he was terminated and *after* his counsel had assured MercuryGate that Lopatkin was "aware of [his] obligation" to preserve information in anticipation of litigation. Specifically, Lopatkin used a computer program called "CCleaner" *multiple times* to destroy evidence on his MercuryGate computer and cover his tracks. Lopatkin ran this program on at least June 19, June 20, and the morning of July 3—the day his lawyer returned the laptop to MercuryGate. Among the evidence destroyed was a desktop folder named "Delete."

**F.     Amous's And Lopatkin's Actions Make It Likely Evidence Will Be Lost, Destroyed, Or Transferred Internationally**

93.     Lopatkin and Amous have conspired to misappropriate the Trade Secrets, including MercuryGate's trade secret source code. Given Defendants' past conduct, there is a very grave and real threat that Lopatkin and Amous will hide, destroy or transfer material evidence at issue in this Verified Complaint.

94.     For example, despite owing fiduciary and contractual obligations to MercuryGate, Lopatkin violated those obligations by forming or helping to form a competing company, Amous, and then by misappropriating the Trade Secrets for his and Amous's benefit. As part of these actions, and as described above, he disabled software on his work computer to prevent MercuryGate from figuring out his illicit activities. Further, he instructed GeltCo, Inc., who is Amous's registered agent, to only send invoices to his personal e-mail account

23

because he knew if MercuryGate discovered his disloyal conduct, he would "be in a lot of trouble."

95.     Amous too has shown its willingness to hide evidence of its wrongful conduct. For example, as discussed above, after receiving MercuryGate's cease and desist letter, Amous removed videos from the internet that showed it misappropriated the appearance and functionality of the MercuryGate confidential user interface.

96.     In addition, both Amous and Lopatkin have strong ties to Ukraine. There is a severe risk that Amous and Lopatkin will use their Ukrainian connections and Ukrainian-based software engineers to move material evidence—including Amous's source code embodying the Trade Secrets—outside of the United States to prevent this Court from being able to stop Amous's misappropriation or even compel discovery of that misappropriation.

97.     Amous and Lopatkin have shown a lack of respect for MercuryGate's property, contractual obligations, and United States laws governing trade secrets and preservation of evidence.

98.     MercuryGate brings this action to protect the Trade Secrets, including its confidential and proprietary trade secret source code that it invested significant time, money, and resources in developing. MercuryGate seeks to hold Amous and Lopatkin accountable for their brazen theft and conspiracy in misappropriating MercuryGate's most sensitive trade secrets.

## COUNT I
### Defend Trade Secrets Act - 18 U.S.C. § 1836 (against all Defendants)

99.     MercuryGate realleges and incorporates by reference the allegations contained in paragraphs 15-29, 32-47, 49-77, and 80-98 above as if fully set forth herein.

100.    MercuryGate's Trade Secrets, set forth in paragraph 22, are statutory "trade secrets" protected by the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1839.

101.    At all times relevant to this dispute, MercuryGate owned confidential and proprietary information related to its TMS software. As described above in paragraphs 24-48, MercuryGate undertook reasonable measures to keep this information secret. This source code took years—and tens of millions of dollars—for MercuryGate to create and develop, and it is of substantial economic value to MercuryGate precisely because its competitors do not have this information.

102.    As set forth more specifically in paragraphs 66-80, Defendant Lopatkin misappropriated MercuryGate's Trade Secrets when he accessed MercuryGate's confidential and proprietary source code and passed that information along to Amous in order to support Amous's development of a competing TMS program.

103.    As set forth more specifically in paragraphs 49-65, Defendant Amous misappropriated this information when it relied on MercuryGate's Trade Secrets, including at least source code to its TMS software in order to assist in the creation of its own TMS application. Amous acquired MercuryGate's Trade Secrets knowing that, or having reason to know that, the proprietary information was acquired by improper means or under circumstances giving rise to a duty to maintain the secrecy of that information, and/or that such information was obtained or derived from Lopatkin, who owes a duty to MercuryGate to maintain the confidentiality of those Trade Secrets.

104.    On information and belief, these acts of misappropriation were undertaken with full knowledge of their impropriety and were done willfully and maliciously.

105.    The information misappropriated and misused by Amous and Lopatkin includes at least MercuryGate's TMS software, which is used in, and intended for use in, interstate and/or foreign commerce.

106.    Amous and Lopatkin's misappropriation has damaged MercuryGate and caused it irreparable harm.

107.    Amous and Lopatkin's misappropriation of MercuryGate's Trade Secrets has been willful and malicious and entitles MercuryGate to exemplary damages and an award of attorneys' fees and costs pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3).

108.    MercuryGate also is entitled to injunctive relief to prevent Amous and Lopatkin from further misappropriating MercuryGate's Trade Secrets, and commanding the return of such materials pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3). Amous's and Lopatkin's misappropriation has and will cause MercuryGate to suffer substantial and irreparable harm unless Amous and Lopatkin are enjoined from retaining and using MercuryGate's Trade Secrets, including by continuing to offer its TMS application.

## COUNT II
## Illinois Trade Secrets Act – 765 Ill. Comp. Stat. 1065/1 *et seq.* (against all Defendants)

109.    MercuryGate realleges and incorporates by reference the allegations contained in paragraphs 15-29, 32-47, 49-77, and 80-98 above as if fully set forth herein.

110.    MercuryGate's Trade Secrets, set forth in paragraph 22, are statutory "trade secrets" protected by the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/2.

111.    At all times relevant to this dispute, MercuryGate owned confidential and proprietary information related to its TMS software. As described above in paragraphs 24-48, MercuryGate undertook reasonable measures to keep this information secret. This source code

took years—and tens of millions of dollars—for MercuryGate to create and develop, and it is of substantial economic value to MercuryGate precisely because its competitors do not have this information.

112. As set forth more specifically in paragraphs 66-80, Defendant Lopatkin misappropriated MercuryGate's Trade Secrets when he accessed MercuryGate's confidential and proprietary source code and passed that information along to Amous in order to support Amous's development of a competing TMS program.

113. As set forth more specifically in paragraphs 49-65, Defendant Amous misappropriated this information when it relied on MercuryGate's Trade Secrets, including at least source code to its TMS software in order to assist in the creation of its own TMS application. Amous acquired MercuryGate's Trade Secrets knowing that, or having reason to know that, the proprietary information was acquired by improper means or under circumstances giving rise to a duty to maintain the secrecy of that information, and/or that such information was obtained or derived from Lopatkin, who owes a duty to MercuryGate to maintain the confidentiality of those Trade Secrets.

114. On information and belief these acts of misappropriation were undertaken with full knowledge of their impropriety and were done willfully and maliciously.

115. The information misappropriated and misused by Amous and Lopatkin includes at least MercuryGate's TMS software, which is used in, and intended for use in, interstate and/or foreign commerce.

116. Amous's and Lopatkin's misappropriation has damaged MercuryGate and caused it irreparable harm.

27

117.    Amous's and Lopatkin's misappropriation of MercuryGate's Trade Secrets has been willful and malicious and entitles MercuryGate to exemplary damages and an award of attorneys' fees and costs pursuant to the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/4-5.

118.    MercuryGate also is entitled to injunctive relief to prevent Amous and Lopatkin from further misappropriating MercuryGate's Trade Secrets, and commanding the return of such materials pursuant to the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/3. Amous's and Lopatkin's misappropriation has and will cause MercuryGate to suffer substantial and irreparable harm unless Amous and Lopatkin are enjoined from retaining and using MercuryGate's Trade Secrets, including by continuing to offer its TMS application.

## COUNT III
### Computer Fraud and Abuse Act - 18 U.S.C. § 1030 (against Lopatkin)

119.    MercuryGate realleges and incorporates by reference the allegations contained in paragraphs 24-48, 66-80, 91, and 92 above as if fully set forth herein.

120.    As described above in paragraphs 36-38, 48, and 71-77, Lopatkin accessed MercuryGate's confidential and proprietary information on MercuryGate's network and computers, which, at all relevant times, were used in or affecting interstate or foreign commerce.

121.    When Lopatkin copied and/or removed information and the Trade Secrets from the MercuryGate network and computers, including MercuryGate's source code, Lopatkin intentionally accessed MercuryGate's network and computers without authorization or exceeded his authorized access and obtained information from MercuryGate's network in violation of at least 18 U.S.C. § 1030(a)(2)(C).

122.    As described above in paragraphs 27-45 Lopatkin's access to MercuryGate's network and computers was without authorization or exceeded his authorized access at least because Lopatkin accessed the network and computers to obtain this information for reasons adverse to MercuryGate, including for his own personal gain and to provide the information to MercuryGate's competitor, Amous.

123.    As set forth more specifically in paragraphs 73 and 91-92, Lopatkin further exceeded his authorized use of MercuryGate's computer when he removed and/or destroyed data, files, and software from his MercuryGate work computer.

124.    As a direct and proximate result of Lopatkin's violation of 18 U.S.C. § 1030(a)(2)(C), MercuryGate has sustained losses exceeding $5,000 in a one-year period, including but not limited to the value of the information taken and costs incurred in determining the scope of his misappropriation.

## COUNT IV
### Breach of Contract (against Lopatkin)

125.    MercuryGate realleges and incorporates by reference the allegations contained in paragraphs 27-92 above as if fully set forth herein.

126.    MercuryGate and Lopatkin entered into an "Agreement Regarding Confidential Information and Intellectual Property" (the "Confidentiality Agreement") governing Lopatkin's use and disclosure of confidential MercuryGate material on August 13, 2010.

127.    In that agreement, Lopatkin agreed "not to disclose [MercuryGate] confidential information, either during or after my employment to any person outside of MercuryGate or its affiliates."

128.   Lopatkin also acknowledged that MercuryGate's computer programs were to be considered "confidential information."

129.   Lopatkin also entered into an "Individual Incentive Compensation Agreement" (the "Compensation Agreement").  That agreement contained non-solicitation and non-competition provisions with MercuryGate, by which Lopatkin agreed, among other things, that he "shall not…either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment with the Company."

130.   Lopatkin further agreed that he shall not "either directly or indirectly engage in activities that compete with the Company or work for any entity that is part of the Company's Market."  Lopatkin is in violation of this restrictive covenant by conspiring with Amous.

131.   As consideration for these agreements, MercuryGate provided Lopatkin with valuable employment opportunities, compensation, and access to sensitive MercuryGate information.

132.   As described above in paragraphs 27-48 and 66-80, Lopatkin breached these agreements by using his access to MercuryGate's networks and information to misappropriate confidential information, as that term is defined in the Confidentiality Agreement, in order to support Amous's efforts to design and develop a competing TMS software.  Lopatkin further breached these agreements by sharing that confidential and proprietary information with Amous, a competitor.

133.   As a direct and proximate result of these breaches, MercuryGate has suffered and will continue to suffer damages, including but not limited to the value of the information taken.

134. Lopatkin's breaches have caused and will cause MercuryGate to suffer substantial and irreparable harm unless Lopatkin is enjoined from violating the terms of the agreements.

## COUNT V
## Tortious Interference with Contract (against Amous)

135. MercuryGate realleges and incorporates by reference the allegations contained in paragraphs 30-98 above as if fully set forth herein.

136. As described above, MercuryGate had a valid and enforceable contractual agreement with Lopatkin called the "Agreement Regarding Confidential Information and Intellectual Property" (the "Confidentiality Agreement").

137. Further, as described above, MercuryGate had a valid and enforceable contractual agreement with Lopatkin called the "Individual Incentive Compensation Agreement" (the "Compensation Agreement").

138. Amous was aware that Lopatkin was under an obligation to keep MercuryGate's information confidential. Further, Amous was aware that Lopatkin was under an obligation to not compete with MercuryGate. On information and belief, and based on industry practice, Amous was aware that high-level employees with access to a company's trade secret source code have confidentiality agreements and non-compete provisions.

139. As described above in paragraphs 30-48 and 66-80, Amous intentionally interfered with the Confidentiality Agreement and Compensation Agreement by using Lopatkin's access to MercuryGate's confidential and proprietary information to improperly misappropriate that information and provide it to Amous in order to support of its development of a competing TMS software.

31

140.    As a direct and proximate result of these actions, MercuryGate has sustained damages, including but not limited to the value of the information taken.

141.    Amous's conduct has caused and will continue to cause MercuryGate to suffer substantial and irreparable harm unless Amous is enjoined from continuing to induce Lopatkin to violate the terms of his agreements, including by using MercuryGate source code in the continued development of its TMS application.

## COUNT VI
### Breach of Duty of Loyalty (against Lopatkin)

142.    MercuryGate realleges and incorporates by reference the allegations contained in paragraphs 27-91, and 94 above as if fully set forth herein.

143.    As described above, Lopatkin was employed by MercuryGate and owed a duty of loyalty to MercuryGate as its employee.

144.    As described above in paragraphs 27-80, Lopatkin breached this duty by coordinating and conspiring with Amous and providing it MercuryGate's trade secret source code.

145.    As a direct and proximate result of these actions, MercuryGate has sustained damages, including return of any compensation paid to Lopatkin during the period in which he breached his fiduciary duty of loyalty, plus pre-judgment and post-judgment interest, and for such further relief as this Court deems just and proper.

## COUNT VII
### Conversion (against all Defendants)

146.    MercuryGate realleges and incorporates by reference the allegations contained in paragraphs 24-80 above as if fully set forth herein.

32

147. As described above, MercuryGate owned confidential and proprietary information related to its TMS software.

148. Amous and Lopatkin wrongfully took possession of this information and used it for their own personal gain. These actions interfered with and were inconsistent with MercuryGate's property rights in that confidential and proprietary information.

149. Amous and Lopatkin's use of MercuryGate's proprietary and confidential information has caused MercuryGate significant harm, including but not limited to the value of the information taken.

150. Amous and Lopatkin's conversion has caused and will cause MercuryGate to suffer substantial and irreparable harm unless Amous and Lopatkin are enjoined from continuing their unlawful use and possession of MercuryGate's Trade Secrets.

**COUNT VIII**
**Civil Conspiracy (against all Defendants)**

151. MercuryGate realleges and incorporates by reference the allegations contained in paragraphs 24-80, 83, and 93-96 above as if fully set forth herein.

152. As described above, Amous and Lopatkin teamed up to misappropriate MercuryGate's trade secret source code in order to develop the Amous TMS software.

153. In achieving these ends, Defendants used unlawful means detailed in the counts above.

154. MercuryGate has suffered damages as a result of Defendants' conspiracy, including but not limited to the value of the information taken.

155.    Amous's and Lopatkin's conversion has caused and will cause MercuryGate to suffer substantial and irreparable harm unless Amous and Lopatkin are enjoined from continuing their conspiracy to misappropriate MercuryGate's Trade Secrets.

## **PRAYER FOR RELIEF**

Wherefore, MercuryGate respectfully requests that the Court:

1.    Enter judgment in favor of MercuryGate and against Amous and Lopatkin on MercuryGate's claims for Defend Trade Secrets Act, Illinois Trade Secrets Act, Computer Fraud and Abuse Act, Breach of Contract, Tortious Interference with Contract, Breach of the Duty of Loyalty, Conversion, and Civil Conspiracy;

2.    Award monetary damages to compensate MercuryGate for the harms described above, including but not limited to the loss of value to MercuryGate's information, unjust enrichment, disgorgement of profits, and disgorgement of compensation Lopatkin received while unfaithful to MercuryGate, in an amount exceeding $75,000 sustained as a result of Amous's and Lopatkin's wrongful actions;

3.    Preliminarily and permanently enjoin Amous and Lopatkin, and any person or entity acting on their behalf or in privity, concert, or participation with them, against further use of MercuryGate's confidential and proprietary Trade Secrets, command the return of such materials, pursuant to the Defend Trade Secrets Act, and the Illinois Trade Secrets Act, the Computer Fraud and Abuse Act, and other applicable law, and enforce Lopatkin's Compensation Agreement;

4.    Award exemplary damages pursuant to the Defend Trade Secrets Act and Illinois Trade Secrets Act for Amous and Lopatkin's willful and malicious misappropriation;

5.      Award MercuryGate its attorneys' fees and costs, including pre-judgment and post-judgment interest, that MercuryGate has been forced to incur, pursuant to the Defend Trade Secrets Act, Illinois Trade Secrets Act, and other applicable law; and

6.      Award any other relief that the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

MercuryGate respectfully demands a trial by jury as to all claims triable to a jury in this action.

DATED: July 24, 2019

Respectfully submitted,

/s/ Megan M. New
Megan M. New (6300422)
megan.new@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200

F. Christopher Mizzo, P.C. (pro hac vice to be filed)
chris.mizzo@kirkland.com
Nathan S. Mammen (pro hac vice to be filed)
nathan.mammen@kirkland.com
James John Lomeo (pro hac vice to be filed)
james.lomeo@kirkland.com
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 389-5000
Fax: (202) 389-5200

*Counsel for MercuryGate International, Inc.*

## VERIFICATION

I, Steven Blough, am Chief Innovation Officer and Co-Founder of MercuryGate International, Inc. ("MercuryGate"), and I am duly authorized to verify this complaint on behalf of MercuryGate. Having read the foregoing Verified Complaint, I can verify that all the facts alleged in the Verified Complaint that are of my own personal knowledge are true and accurate to the best of my belief, and all other allegations contained in the complaint are well grounded in fact and have evidentiary support, or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

Dated: July 23, 2019

_____
Steven Blough